AO-106 (Rev. 06/09)-Application for Search Warrant

**FILED**

JUL 15 2024

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*2301 North Atlanta Place, Tulsa Oklahoma*<br>*74110* | )<br>)<br>)<br>)<br>) |

Case No. 24-mj-477-MTS

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the Northern District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)** | **Possession of Methamphetamine with Intent to Distribute** |
| **21 U.S.C. §§ 856(a)(1) and 856(b)** | **Maintaining a Drug Involved Premises** |

The application is based on these facts:
**See Affidavit of William Mackenzie, attached hereto**.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

William Mackenzie, DEA TFO
*Printed name and title*

Subscribed and sworn to in person.

Date: 7-15-2024

*Judge's signature*

City and state:  Tulsa, Oklahoma

Mark T. Steele, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

In the Matter of the Search of
2301 North Atlanta Place,
Tulsa, Oklahoma 74110

Case No. _____

FILED UNDER SEAL

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, William R. Mackenzie, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search 2301 North Atlanta Place, Tulsa, Oklahoma 74110, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, as further described in Attachment A, for the things described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant.

3. I am deputized as a Task Force Officer (TFO) with the Drug Enforcement Administration, United States Department of Justice, and am presently assigned to the DEA Tulsa Resident Office in Tulsa, Oklahoma. I am also a Tulsa Police

Department officer and have been so employed for over 23 years. I have a bachelor's

degree in criminal justice from East Central University. Since becoming a narcotics

detective with TPD's Special Investigations Division (SID), I have participated in

wire and physical surveillance, surveillance of undercover transactions, the

introduction of undercover agents, the execution of search warrants, informant

debriefings, and reviews of taped conversations and drug records. From my training,

education, and experience, I am familiar with the way illegal drugs are transported,

stored, and distributed, methods of payment for illegal drugs, and slang/code words

used by those discussing illegal activities related to drug production, processing,

transportation, and distribution. I have been the primary investigator in over ten

complex conspiracy cases prosecuted within the federal justice system.

4. I received formal training in narcotics investigations from TPD's academy and

informal training from more experienced officers. I have also completed:

    a. Oklahoma State Bureau of Investigations Clandestine Laboratory Basic
       Safety Certification and Clandestine Laboratory Site Safety Officer
       courses, presented by Network Environmental Systems;

    b. DEA Basic Narcotics Investigator School;

    c. Advanced Undercover Narcotics School;

    d. Southwest Border Intelligence School and Outlaw Motorcycle Gang
       School, presented by Association of Oklahoma Narcotics Enforcers
       (AONE);

    e. Complex Conspiracies School, presented by the Midwest Counter-Drug
       Training Center; and

    f. Communications Exploitations Training, presented by DEA Special
       Operations Division.

In addition to my own training, I have trained other narcotics detectives within TPD SID and DEA. I also taught an AONE class on heroin distribution in the United States.

5. I have participated in more than 500 drug-related criminal investigations. I have authored federal Title III affidavits and state and federal search warrants. I have participated in several Title III investigations, purchased narcotics in an undercover capacity on numerous occasions, and executed controlled deliveries of narcotics. I have interviewed hundreds of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances. During these interviews, I have inquired and learned how individuals involved in drug distribution scheme and networks use and disperse illegal proceeds generated from the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly used in the illegal manufacture of methamphetamine. Through my involvement in Title III investigations, undercover narcotics buys, and interviews of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances, I have become familiar with slang and code words used to refer to the use, manufacture, transportation, illegal sale, quantities, and types of controlled dangerous substances.

6. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my participation in this investigation, knowledge obtained from other law enforcement officers, my review of documents

related to this investigation, and conversations with others who have personal
knowledge of the events and circumstances described herein. Because this affidavit is
submitted for the limited purpose of establishing probable cause in support of the
application for a search warrant, it does not set forth each and every fact that I or
others have learned during the course of this investigation.

7. Based on my training, experience, and the facts set forth in this affidavit, there
is probable cause to believe that evidence of violations of Title 21, U.S.C. §§
841(a)(1) and 841(b)(1)(C) – Possession with Intent to Distribute Methamphetamine;
and Title 21, U.S.C. §§ 856(a)(1) and 856(b) – Maintaining a Drug Involved
Premises, will be located at 2301 North Atlanta Place, Tulsa, Oklahoma 74110,
Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles
on the curtilage premises, as further described in Attachment A.

**Jurisdiction**

8. "[A] warrant may be issued to search for and seize any property that
constitutes evidence of a criminal offense in violation of the laws of the United
States." 18 U.S.C. § 3103a.

9. The requested search is related to the following violations of federal law:

    a. Title 21, U.S.C. §§ 841(a)(1) and 841(b)(1)(C) – Possession with Intent
       to Distribute Methamphetamine; and

    b. Title 21, U.S.C. §§ 856(a)(1) and 856(b) – Maintaining a Drug Involved
       Premises.

10. Venue is proper because the person or property described in this affidavit is
located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

4

### Drug Offenses Background

11. During the course of my training and experience, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

12. I also know, based on my training and experience, that drug traffickers frequently conduct counter surveillance maneuvers after departing from meetings with other members of their drug trafficking organizations ("DTO") in order to deter law enforcement detection.

13. Based on my background, training, and experience, as previously detailed in this affidavit, I know:

 a. Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

 b. Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

5

c. Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing drug activities;

d. Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase and transfer of controlled substances;

e. Drug traffickers often keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where drug traffickers have ready access to them, i.e., on their persons, in their vehicles,  in or about their residences and places of business. These documents are often kept in code to secret their meaning from law enforcement;

f. It is common for drug traffickers to hide contraband, proceeds of drug sales, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions, records and evidence of drug transactions relating to transferring, hiding or spending large sums

6

of money made from engaging in drug trafficking in secure locations on their persons, within their vehicles, within or around their residences and businesses for ready access or to conceal them from law enforcement authorities;

g. When drug traffickers collect proceeds from the sale of drugs, they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations and business frauds;

h. Drug traffickers commonly maintain names, addresses and telephone numbers in books or papers for their associates in the trafficking organization. These books or papers include such items as address books, telephone messages, etc. Shorthand and/or code names are sometimes used for buyers, co-conspirators, sellers, weights and other details of the drug traffickers;

i. Drug traffickers hide and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that

7

courts have recognized that unexplained wealth is derived from crimes motivated by greed, in particular, drug trafficking;

j.  The books, records, receipts, notes, ledgers, and other items mentioned above are commonly maintained where the drug traffickers have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k.  Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their products. These traffickers usually maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l.  Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing drugs. This paraphernalia includes, but is not limited to, scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m.  Drug traffickers frequently package illegal narcotics in vacuum sealed bags. Vacuum sealed bags help mask the smell of illegal narcotics, which assists drug traffickers with deterring law enforcement detection. Additionally, mid-level distributors frequently repackage the illegal narcotics they receive from their source of supply ("SOS") into smaller quantities.

8

n.  Drug traffickers often keep handguns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard supplies of drugs and the proceeds of drug sales;

o.  Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

p.  Drug traffickers commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities.

q.  Persons engaged in drug trafficking often carry and possess firearms during and in relation to and in furtherance of their crimes. They also photograph themselves and others with controlled substances, firearms, and money proceeds. Such photographs are often kept in digital form on cell phones. Individuals involved in drug trafficking also trade images of firearms and/or other items used in or derived from their illegal activity on their cell phones;

9

r. Those involved in domestic or international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications;

s. Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

t. Individuals involved in illegal activities like drug trafficking often generate large amounts of cash from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of financial transactions to disguise and conceal profits. Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity. Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property or financial institutions.

14. Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that

10

computer data can be stored on a variety of systems and storage devices including, but not limited to, hard disk drives, floppy disks, thumb drives, compact disks, magnetic tapes, memory chips, cellular telephones, iPads and other portable electronic devices. I also know that during the search of a premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to

11

conducting a complete and accurate analysis of the equipment and
storage devices from which the data will be extracted;

c. Because of these facts, it is often necessary for computers, cellular
telephones, iPads and other portable electronic devices and all related
computer equipment to be seized during a premises search in order to
conduct a search by Forensic Examiners in the well-equipped and
controlled environment of a laboratory setting. If any electronic storage
device is seized during the search of the premises described in
Attachment A, a separate warrant will be sought before searching those
storage devices for data.

### Probable Cause

15. On April 25, 2024, TPD SID investigators executed a search warrant on a
house at 2126 East Seminole Street, Tulsa, Oklahoma 74110. During that search
warrant operation, investigators seized more than 5 kilograms of methamphetamine
and arrested multiple occupants at the house. The bulk of the methamphetamine was
found beneath a temporary floor in a shed in the back yard.

16. Several days earlier, on April 17, 2024, TPD Officer Donato was conducting
surveillance in the area of 2126 East Seminole Street and saw a Hispanic male
driving a 2013 red Ford Taurus arrive at the house at 2127 East Seminole Street.
Officer Donato saw the Hispanic male get out of the Taurus and go into the back
yard at 2126 East Seminole Street. TPD Officer Turner, who was also conducting

12

surveillance in the area, believed the Hispanic male matched the physical description of someone who he knew as "Eder Francisco" from prior police contacts.

17. After spending several minutes in the back yard at 2126 East Seminole Street, the Hispanic male returned to the Taurus and drove away. TPD Lieutenant Adair, who was also surveilling the area, saw that the Taurus' license plate was Oklahoma tag ORW693. Using law enforcement databases, investigators subsequently determined that Oklahoma tag is registered to Eder Francisco Ramirez with an address of 2317 West Fulton Street, Broken Arrow, Oklahoma.

18. On May 24, 2024, TPD Officer Criner and I participated in an interview of a Cooperating Defendant (CD) who identified his/her source of methamphetamine supply as a Hispanic male named "Eder" who drives a "red car." During the interview, I showed CD a photograph of Eder Francisco Ramirez and CD positively identified him as the same "Eder" who was his/her source of methamphetamine supply. CD told us that "Eder" also supplies a woman named "Angela Lucius" with methamphetamine to distribute.

19. On May 20, 2024, TPD Officer Criner spoke with a TPD confidential source (CS) about a person named "Angie Lucius." The CS said that Lucius sells large amounts of methamphetamine. The CS further stated he/she believes Lucius' supplier is a Hispanic male named "Eder" who drives a red Ford Taurus bearing Oklahoma tag ORW693. The CS told Officer Criner that Lucius lives in a home at 2301 North Atlanta Place, Tulsa, Oklahoma 74110.

13

20. Using the CS, Officer Criner coordinated the controlled purchase of methamphetamine from "Angie Lucius" at 2301 North Atlanta Place. Before the controlled buy, officers searched the CS and did not find any drugs or currency. Officer Criner gave the CS Tulsa Police Department controlled buy funds to purchase the methamphetamine with.

21. The CS then went to 2301 North Atlanta Place while TPD officers maintained visual surveillance. The CS entered the home at 2301 North Atlanta Place and remained inside for a short time before exiting. TPD officers maintained visual surveillance of the CS until he/she was back in the officers' presence, at which time the CS gave Officer Criner a clear plastic bag containing a quantity of white crystal substance consistent with methamphetamine. The white crystal substance was field tested using a TruNarc, which yielded a presumptive positive result for methamphetamine. The CS told Officer Criner that Lucius was asleep when he/she arrived at the home at 2301 North Atlanta Place and that another person who the CS identified as "Shawna Brown" sold him/her the methamphetamine.

22. On May 23, 2024, Officer Criner met with the same CS and instructed him/her to coordinate the purchase of methamphetamine from Lucius. Before the controlled buy, officers searched the CS and did not find any drugs or currency. Officer Criner gave the CS Tulsa Police Department controlled buy funds to purchase the methamphetamine with. The CS then went to 2301 North Atlanta Place while TPD officers maintained visual surveillance. The CS entered the home at 2301 North Atlanta Place and remained inside for a short time. Upon exiting, the CS

14

met TPD officers at a predetermined location and turned over a clear baggie containing a quantity of white crystal substance consistent with methamphetamine. The white crystal substance was field tested using a TruNarc, which yielded a presumptive positive result for methamphetamine. The CS told Officer Criner that he/she bought the methamphetamine from Lucius.

23. Officer Criner conducted a query of Lucius using TRACIS and discovered Lucius had a prior arrest in 2003 for possession of a controlled substance with intent to distribute. Officer Criner also found a June 2024 TRACIS entry for domestic assault and battery involving Lucius, in which she listed her home address as 2301 North Atlanta Place, Tulsa, Oklahoma.

24. On June 24, 2024, Officer Criner spoke with DEA TFO Pryce, who is familiar with Eder Francisco Ramirez from prior contacts. TFO Pryce told Officer Criner he recently saw Ramirez in a black Chevrolet Silverado bearing Oklahoma tag PJZ719.

25. During this investigation, TPD officers have seen a black Chevrolet Silverado bearing Oklahoma tag PJZ719 at 2317 West Fulton, Broken Arrow, Oklahoma. That is the same address where the red 2013 Ford Taurus associated with Ramirez is registered.

26. Within the last 24 hours, TPD Officer Criner was conducting surveillance on the home at 2301 North Atlanta Place, Tulsa, Oklahoma 74110. During that surveillance she saw a Hispanic male enter and exit the home several times. She also saw the Hispanic male remove several large duffle bags from a black Chevrolet

Silverado bearing Oklahoma tag PJZ719 and carry them into the home at 2301 North Atlanta Place, Tulsa, Oklahoma 74110.

27. Officer Criner has had prior contacts with Eder Francisco Ramirez and is familiar with his physical appearance. Based on that, she recognized Ramirez was the Hispanic male who she saw carrying the large duffle bags into the home at 2301 North Atlanta Place, Tulsa, Oklahoma 74110.

28. On July 15, 2024, I drove by the house at 2301 North Atlanta Place, Tulsa, Oklahoma 74110 to conduct surveillance. While I was in the area, I saw short term foot traffic entering and exiting the home. From my background, training, and experience, and all the other facts and circumstances of this investigation, I recognized that activity as being consistent with drug distribution at the location where it is occurring.

**Conclusion**

29. Based on the information above, I submit that there is probable cause to search 2301 North Atlanta Place, Tulsa, Oklahoma 74110, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, as further described in Attachment A, for the things described in Attachment B.

30. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

William R. Mackenzie
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by phone on July ___, 2024.

MARK T. STEELE
UNITED STATES MAGISTRATE JUD

17

## ATTACHMENT A

### Property to be Searched

The property to be searched is a residence located at **2301 North Atlanta Place, Tulsa, Oklahoma 74110**, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, further described as a residence constructed of tan and green siding with a tan sloped roof. The residence is on the northeast corner of East Xyler Street and North Atlanta Place. There is a white storm door on the south side of the residence adjacent to East Xlyer Street and a white door on the west side of the residence adjacent to North Atlanta Place. The numbers "2301" are located on the mailbox on the west side of the residence. The residence to be searched is more commonly known as 2301 North Atlanta Place, Tulsa, Oklahoma 74110, Tulsa County, and is located within the Northern District of Oklahoma.





## ATTACHMENT B

### Particular Things to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of violations of Title 21, U.S.C. §§ 841(a)(1) and 841(b)(1)(C) – Possession with Intent to Distribute Methamphetamine; and Title 21, U.S.C. §§ 856(a)(1) and 856(b) – Maintaining a Drug Involved Premises, including:

a. Documents showing ownership of real or personal property;

b. United States Currency or items reflecting drug proceeds;

c. Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data;

d. Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

20

e. Items of personal property tending to establish the existence of a narcotics conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

f. Paraphernalia for distributing, packaging, and weighing narcotics. Equipment and materials used in the building or using concealed compartments;

g. Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

h. Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

i. Records and items reflecting travel for the purpose of participation in drug trafficking including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long-distance calls reflecting domestic and foreign travel;

j. Any and all appointment calendars;

k. Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other

financial transactions including the purchase of real estate and documents showing ownership of real estate;

l.  Records relating to employment, wages earned and paid and other compensation records. Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

m. Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly: financial records of withdrawals, funds transfers, purchases, sales, transfers or consolidation of assets. Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

n.  Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

o.  Cellular telephones;

p.  Electronically stored data on cellular telephones or other electronic storage devices, such as PDA's or electronic organizers;

q.  Electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon. Computers and

data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device; and

r. Firearms, ammunition, and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

No seized cellular phones, storage media, or other devices containing electronically stored information will be searched without obtaining another search warrant for the data therein.